ROBERTSON et al. *v.* WELCH

No. 41998          November 6, 1961          134 So. 2d 491

*Carter & Van Every,* Columbus; *Lanier Douglas,* Starkville, for appellants.

*Thomas J. Tubb*, West Point; *Beach, Davidson & Beach*, Jackson, for appellee.

Lee, P. J.

Mrs. Ruby Smith Robertson and others, the sisters and father and sole heirs at law of Mrs. Mattie Raines, deceased, instituted this suit against George Welch to

recover damages for her wrongful death, allegedly occasioned by reason of the defendant's negligent operation of an automobile. There was a verdict for the defendant, and the plaintiffs appealed.

The appellants have assigned and strenuously argued several alleged errors, especially that they were entitled to a peremptory instruction on liability and that the court erred in refusing their requested instruction to that effect. This question involves the heart of this appeal and is decisive of the controversy.

The death occurred about 11:00 P. M. on October 23, 1959 on Highway No. 82 a short distance west of the Tombigbee River. This was a closely built up area. Two night clubs or taverns were almost opposite each other on the highway and other establishments, both east and west, were situated nearby. The Lakeview Club was located on the south side of the highway and the Hi-Hat was on the north side. The twenty-foot wide pavement, with gravel on the shoulders, led over a substantial concrete bridge to the east. The stretch of road was designated as a 35 mile speed zone. It had been raining and it was still misty and foggy at the time.

Welch was driving west in his 1959 Model 98 Oldsmobile in his proper lane, on the north side, from Columbus to his home in Maben.

John Rufas Baswell, Jesse Cummings, Mattie Raines, and Margaret Higgins had been at the Lakeview Club for different periods of time. They decided to cross over the road to the Hi-Hat Club. To that end, they were walking somewhat diagonally across the highway with Baswell ahead, Cummings to the right, and Mrs. Raines and Margaret Higgins, in that order, to Cummings' left. When Baswell and Cummings saw the light of the approaching Welch car, it was several hundred feet to the east. James Haynes, in his parked car on the south side of the road, saw the lights of the Welch car flash on brightly a short distance east of the concrete bridge.

The driver did not blow his horn. No other car was approaching from either direction. The Oldsmobile hit Cummings' right foot and knocked him down. It next struck Mattie Raines, who was 3 or 4 feet from the north edge of the pavement. Margaret Higgins was on the ground after the car passed. When the body of Mattie Raines came to rest—she was apparently killed instantly—it was variously estimated to be 100 to 150 feet from the place where the parties were crossing the road. The three eyewitnesses for the plaintiffs estimated the speed of the Welch car at from 60 to 85 miles an hour.

The highway patrolman, who arrived at the scene at 11:35 P. M., said that a puddle of blood was found about 250 to 300 feet from the west abutment of the concrete bridge. He also found that Welch's car, with the damaged right headlight and fender, was parked about 90 feet from that point. He could find no evidence of skidding. He talked to Welch, who told him that "he was driving down the road headed toward Maben * * * and * * * that he was on them before he saw them * * * he just didn't see them until he had hit them, he was on them before he saw them".

As the first witness, plaintiffs called Welch as an adverse witness for the purpose of cross examination. He admitted that he knew this to be a 35-mile zone; that it was "misting rain and you couldn't hardly see a thing"; that "all at once something hit my car and I didn't know what it was that night and I turned around and got on the other side of the street, I said, 'Did you have a blow-out?' I said, 'No, I must have hit something.' So I got out and went back and I said, 'My goodness, I have hit a woman';" that he had no idea where Mrs. Raines came from or where she was going; that "I didn't even know what I hit." He then said that "Somebody either pushed her or she stumbled in front of me * * * they was all staggering drunk * * * some of them was * * * They was all stumbling and one woman fell down there and all the

rest of them and they loaded the whole business up trying to get there and come to find out they was drunk and dismissed them from the hospital.'' He said that under ordinary conditions, one could see ''a good piece, but that night you couldn't see anything because it was raining * * * you couldn't see anything then.'' Again he said, ''when I hit her I didn't know what it was''. As to the other parties he said ''I didn't see them, I don't know what happened there.'' And, when again he was asked ''In other words, what you are telling the jury is you just didn't see anybody until your car hit something and you heard the licks?'' He replied, ''That's right.'' In connection with the stumbling, he finally said ''If she stumbled into me, I didn't see them, but they got in there anyway. I was in the highway.'' The only question which his counsel asked him was: ''State whether or not from the time you left the bridge crossing the Tombigbee River at Columbus until the time of this accident you kept a constant lookout ahead in your automobile at the highway?'' The objection of the plaintiffs' counsel to this question, that it was leading, was overruled; and his answer then was: ''I did.''

These facts are undisputed or admitted: Mrs. Raines and three other adult persons were crossing from the south to the north side of the pavement, strung out several feet apart. Welch was going west and was in his proper lane on the north side of the pavement. His speed was at least 35 miles an hour—the three witnesses for the plaintiffs placed it at 60 to 85 miles an hour, and the car did not stop until it had gone 100 to 150 feet from the place of the collision. Welch admitted on the witness stand that he could not see anything; that he saw no one of the four people as they were crossing the road; that he did not see Mrs. Raines before he struck her; and that it was only after the lick that he turned around and found that he had struck her.

■■ While it is true that the law permitted a motorist to operate his automobile in this area at a maximum speed of 35 miles per hour, that principle presupposes a compliance with the other known rules of safety, namely, to keep his car under control and be on the alert for pedestrians and others using the highway. Ulmer v. Pistole, 115 Miss. 485, 76 So. 522; Snyder v. Campbell, 145 Miss. 287, 110 So. 678; Murphy v. Latham, 210 Miss. 434, 49 So. 2d 807.

■■ Welch was under the further legal obligation at the time to drive his automobile at such speed as to avoid injury to persons coming within the range of his lights. Frazier v. Hull, 157 Miss. 303, 127 So. 775; Rhodes v. Fullilove, 161 Miss. 41, 134 So. 841; Jackson City Lines v. Harkins, 204 Miss. 707, 38 So. 2d 102; Shofner v. Illinois Central R. Co., 188 Fed. Supp. 422.

■■ Under his own sworn statement to the jury, Welch was driving his automobile down a national highway, in a closely built up area, at a late hour of a misty rainy night, at a speed of 35 miles an hour, when he was unable to see anything, even see to four adult persons who had already walked almost entirely across the road in front of him in full view, if he was looking. In other words, the deceased was hit by the right fender and light of his car after she had almost cleared the path of the approaching vehicle. Since he had lights on his car, it is incredible that he did not see these people, if he was in fact looking. In a belated effort to extenuate his conduct, he finally surmised that the decedent must have stumbled in front of him. This was not a statement by him of a positive and definite fact. Buntyn v. Robinson, 233 Miss. 360, 102 So. 2d 126. It was pure conjecture, because he had repeatedly vowed and declared that he did not even see Mrs. Raines before he hit her—and if he did not see her before he hit her, obviously he was not able to testify that she had stumbled under the car.

Although Welch was permitted to say, over the plaintiffs' objection, when the words were put into his mouth by his counsel, that he had been keeping a constant lookout ahead, everything else that he said and did was at complete variance with, and denial of, that answer. Such a statement, so contrary to fact, does not reach the dignity of being treated as a different version in his testimony.

The appellee had his lights on. Yet, because of the condition of the weather, he could not see. If this was true, then he had no right whatever to operate his automobile blindly down this highway at 35 miles an hour. Keith v. Yazoo & M. V. R. Co., 168 Miss. 519, 151 So. 916; Evans Motor Freight Lines, et al v. Fleming, 184 Miss. 808, 185 So. 821; Miss. Power & Light Co. v. Lembo. 202 Miss. 532, 32 So. 2d 573; Matthews v. Thompson, 231 Miss. 258, 95 So. 2d 438.

To all intents and purposes Welch, if he was telling the truth, might as well have been physically blind. It should be indelibly seared into the memory of all motorists that neither the law nor the courts can, or will, turn loose, to kill and maim persons on the highways of this state, drivers, who are either physically blind, or are so indifferent to their responsibility to others that they do not see although they have eyes for that purpose.

It is said that the evidence showed that some of these parties were drinking, and that Margaret Higgins, who did not testify, was drunk. Conceding that the evidence justified such a finding, at the same time it does not release the appellee from compliance with the law or with the observance of the reasonable rules of care. Intoxication, either in whole or in part, does not place the addict beyond the protection of the law. After all, such an unfortunate has rights just as any other human being or member of society.

The Court is mindful of the fact that if, under the appellee's version, there had been conflicts in his

statements as to the proximate cause of the collision, then it would have been for the jury to determine which statement, in fact, was true. Dearman v. Partridge, 239 Miss. 611, 124 So. 2d 680, and authorities there cited. But, when his version is stripped of its pure speculation and conjecture, there is no conflict so far as materiality is concerned. His conduct stands out as a glaring instance of unadulterated carelessness and negligence.

From what has been said, it follows that the plaintiffs' requested peremptory instruction to the jury to find a verdict for them should have been given and the cause should have been submitted to the jury on the sole question of damages. It is therefore not necessary to deal with the other alleged errors.

The cause is, therefore, reversed and a judgment will be entered here for the appellants on liability, and the cause will be remanded for a new trial on the question of damages only.

Reversed; judgment here for appellants as to liability; remanded for a new trial on damages only.

*Arrington, McElroy, Rodgers* and *Jones, JJ.*, concur.